# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| CHASITY VERNON, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>v.<br><br>ELECTROSTIM MEDICAL SERVICES, INC.,<br><br>                    Defendant. | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Case No: |

Plaintiff Chasity Vernon ("Plaintiff"), on behalf of herself and all similarly situated persons, alleges the following against Electrostim Medical Services, Inc. ("Electrostim" or "Defendant") based upon personal knowledge with respect to herself and on information and belief derived from, among other things, investigation by her counsel and review of public documents as to all other matters:

## I.    INTRODUCTION

1.      Plaintiff brings this class action against Electrostim for its failure to properly secure and safeguard her and other similarly situated Electrostim clients' patients' personally identifiable information ("PII") and protected health information ("PHI"), including names, demographic information such as addresses, emails and phone numbers, diagnoses, insurance information and subscriber numbers, and products prescribed and billed (the "Private Information") from criminal hackers.

2.      Electrostim, based in Tampa, Florida, is a privately held medical device company "specializing in home electrical stimulation devices, bracing, and accessories for pain management and physical rehabilitation."[1]

3.      On or about the end of December 2023, Electrostim sent out data breach letters (the "Notice") to individuals whose information was compromised as a result of the hacking incident.

4.      Based on the Notice sent to Plaintiff and "Class Members" (defined below), unusual activity was detected on its computer systems on or around May 13, 2023. In response, Defendant launched an investigation which revealed that an unauthorized party had access to certain files that contained sensitive information, and that such access took place between April 27 and May 13, 2023 (the "Data Breach"). Yet, Electrostim waited *seven months* to notify the public that they were at risk.

5.      As a result of this delayed response, Plaintiff and Class Members had no idea for *seven months* that their Private Information had been compromised, and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm. The risk will remain for their respective lifetimes.

6.      There has been no assurance offered by Electrostim that all personal data or copies of data have been recovered or destroyed, or that Defendant has adequately enhanced its data security practices sufficient to avoid a similar breach of its network in the future.

7.      Therefore, Plaintiff and Class Members have suffered and are at an imminent, immediate, and continuing increased risk of suffering, ascertainable losses in the form of harm from identity theft and other fraudulent misuse of their Private Information, the loss of the benefit of their bargain, out-of-pocket expenses incurred to remedy or mitigate the effects of the Data

---

[1] *See* https://www.wecontrolpain.com/about (last visited on Jan. 9, 2024).

Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

8.      Plaintiff brings this class action lawsuit to address Electrostim's inadequate safeguarding of Class Members' Private Information that it collected and maintained, and its failure to provide timely and adequate notice to Plaintiff and Class Members of the types of information that were accessed, and that such information was subject to unauthorized access by cybercriminals.

9.      The potential for improper disclosure and theft of Plaintiff's and Class Members' Private Information was a known risk to Electrostim, and thus Electrostim was on notice that failing to take necessary steps to secure the Private Information left it vulnerable to an attack.

10.     Upon information and belief, Electrostim failed to properly monitor and properly implement security practices with regard to the computer network and systems that housed the Private Information. Had Electrostim properly monitored its networks, it could have prevented the Data Breach, or at least discovered it sooner.

11.     Plaintiff's and Class Members' identities are now at risk because of Electrostim's negligent conduct as the Private Information that Electrostim collected and maintained is now in the hands of data thieves and other unauthorized third parties.

12.     Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose Private Information was accessed and/or compromised during the Data Breach.

13.     Accordingly, Plaintiff, on behalf of herself, and the Class, asserts claims for negligence, breach of third-party beneficiary contract, unjust enrichment, and declaratory/injunctive relief.

## II.    **PARTIES**

14.    Plaintiff Chasity Vernon is, and at all times mentioned herein was, an individual citizen of the State of North Carolina. Plaintiff received the Notice, via U.S. mail, directly from Defendant, in early January.

15.    Defendant Electrostim Medical Services, Inc. was incorporated under the state laws of Delaware, with its principal place of business located at 3504 Cragmont Drive, Suite #100, Tampa, Florida 33619.

## III.    **JURISDICTION AND VENUE**

16.    The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from Electrostim. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

17.    This Court has jurisdiction over Electrostim because Electrostim operates in, conducts substantial business in, and has its principal place of business in this District.

18.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District and Electrostim has harmed Class Members residing in this District.

## IV.    **FACTUAL ALLEGATIONS**

### A.  *Electrostim's Business and Collection of Plaintiff's and Class Members' Private Information*

19.     Defendant is a privately held medical device company "specializing in home electrical stimulation devices, bracing, and accessories for pain management and physical rehabilitation."[2]

20.     In order to obtain medical products, devices, and/or services from Defendant's healthcare entity clients, Defendant requires its clients' patients, like Plaintiff Vernon, to provide sensitive and confidential Private Information, including their names, dates of birth, PHI, and other sensitive information.

21.     In its Privacy Policy, Electrostim promises to only medical information about its product users "when required to do so by federal, state or local law."[3] The Privacy Policy goes on to list other instances under which Defendant may disclose Plaintiff's and Class Members' Private Information – none of which are applicable here.

22.     Due to the highly sensitive and personal nature of the information Electrostim acquires and stores with respect to its clients' patients, Electrostim, upon information and belief, promises to, among other things: keep patient Private Information private; comply with industry standards related to data security and the maintenance of patient Private Information; inform its clients and its clients' respective patients of its legal duties relating to data security and comply with all federal and state laws protecting patient Private Information; only use and release patient Private Information for reasons that relate to the services it provides; and provide adequate notice to individuals if their Private Information is disclosed without authorization.

23.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Electrostim assumed legal and equitable duties it owed to them

---

[2] *See* https://www.wecontrolpain.com/about (last visited on Jan. 9, 2024).
[3] *See* https://www.wecontrolpain.com/privacy-policy (last visited Jan. 9, 2024).

and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure and exfiltration.

24.     Plaintiff and Class Members relied on Electrostim to keep their Private Information confidential and securely maintained and to only make authorized disclosures of this Information, which Defendant ultimately failed to do.

### B.   The Data Breach and Defendant's Inadequate Notice to Plaintiff and Class Members

25.     According to Defendant's Notice, it learned of unauthorized access to its computer systems on or around May 13, 2023, with such unauthorized access having taken place between April 27 and May 13, 2023.

26.     Through the Data Breach, the unauthorized cybercriminal(s) accessed a cache of highly sensitive Private Information, including names, demographic information, including phone numbers and email addresses, diagnoses, insurance information, and other PHI.

27.     On or around late December of 2023, roughly *seven months* after Electrostim learned that the Class's Private Information was first accessed by cybercriminals, Electrostim finally began to notify its clients' patients that its investigation determined that their Private Information was accessed as a result of the Data Breach.

28.     Electrostim had obligations created by contract, industry standards, common law, and representations made to Plaintiff and Class Members and their respective healthcare providers to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

29.     Plaintiff and Class Members provided their Private Information to Electrostim with the reasonable expectation and mutual understanding that Electrostim would comply with its

obligations to keep such Information confidential and secure from unauthorized access and to provide timely notice of any security breaches.

30.    Electrostim's data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

31.    Electrostim knew or should have known that its electronic records would be targeted by cybercriminals.

### C.  The Healthcare Sector is Particularly Susceptible to Data Breaches

32.    Electrostim was on notice that companies in the healthcare industry are susceptible targets for data breaches.

33.    Electrostim was also on notice that the FBI has been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PHI)."[4]

34.    The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of

---

[4] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, Reuters (Aug. 2014), *available at* https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820 (last visited on Jan. 9, 2024).

patients' health and financial information, but also patient
access to care.[5]

35.     The healthcare sector reported the second largest number of data breaches among
all measured sectors in 2018, with the highest rate of exposure per breach.[6] In 2022, the largest
growth in compromises occurred in the healthcare sector.[7]

36.     Indeed, when compromised, healthcare related data is among the most sensitive and
personally consequential. A report focusing on healthcare breaches found that the "average total
cost to resolve an identity theft-related incident … came to about $20,000," and that the victims
were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore
coverage.[8]

37.     Almost 50 percent of the victims lost their healthcare coverage as a result of the
incident, while nearly 30 percent said their insurance premiums went up after the event. Forty
percent of the customers were never able to resolve their identity theft at all. Data breaches and
identity theft have a crippling effect on individuals and detrimentally impact the economy as a
whole.[9]

---

[5] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, Am. Med. Ass'n. (Oct. 4, 2019), *available at*: https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals (last visited on Jan. 9, 2024).

[6] Identity Theft Resource Center, *2018 End-of-Year Data Breach Report, available at*: https://www.idtheftcenter.org/2018-data-breaches/ (last visited on Jan. 9, 2024).

[7] Identity Theft Resource Center, *2022 End-of-Year Data Breach Report, available at*: https://www.idtheftcenter.org/wp-content/uploads/2023/01/ITRC_2022-Data-Breach-Report_Final-1.pdf (last visited on Jan. 9, 2024).

[8] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), *available at:* https://www.cnet.com/news/privacy/study-medical-identity-theft-is-costly-for-victims/ (last visited on Jan. 9, 2024).

[9] *Id.*

38.     Healthcare related breaches have continued to rapidly increase because electronic patient data is seen as a valuable asset. "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[10]

39.     As a healthcare provider, Electrostim knew, or should have known, the importance of safeguarding its patients' Private Information, including PHI, entrusted to it, and of the foreseeable consequences if such data were to be disclosed. These consequences include the significant costs that would be imposed on Electrostim's patients as a result of a breach. Electrostim failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

### D.  Electrostim Failed to Comply with HIPAA

40.     Title II of HIPAA contains what are known as the Administration Simplification provisions. *See* 42 U.S.C. §§ 1301, *et seq*. These provisions require that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PHI similar to the data Defendant left unguarded and vulnerable to attack. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

41.     Electrostim's Data Breach resulted from a combination of insufficiencies that indicate Electrostim failed to comply with safeguards mandated by HIPAA regulations and industry standards. First, it can be inferred from Electrostim's Data Breach that Electrostim either

---

[10] Inside Digital Health, *How to Safeguard Hospital Data from Email Spoofing Attacks*, April 4, 2019, *available at*: https://www.chiefhealthcareexecutive.com/view/how-to-safeguard-hospital-data-from-email-spoofing-attacks (last visited on Jan. 9, 2024).

failed to implement, or inadequately implemented, information security policies or procedures to protect Plaintiff's and Class Members' PHI.

42.     Plaintiff's and Class Members' Private Information compromised in the Data Breach included "protected health information" as defined by CFR § 160.103.

43.     45 CFR § 164.402 defines "breach" as "the acquisition, access, use, or disclosure of protected health information in a manner not permitted under subpart E of this part which compromises the security or privacy of the protected health information."

44.     45 CFR § 164.402 defines "unsecured protected health information" as "protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology specified by the [HHS] Secretary[.]"

45.     Plaintiff's and Class Members' Private Information included "unsecured protected health information" as defined by 45 CFR § 164.402.

46.     Plaintiff's and Class Members' unsecured PHI was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, as a result of the Data Breach.

47.     Based upon Defendant's Notice to Plaintiff and Class Members, Electrostim reasonably believes that Plaintiff's and Class Members' unsecured PHI has been acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, as a result of the Data Breach.

48.     Plaintiff's and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

49.     Electrostim reasonably believes that Plaintiff's and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR,

Subpart E as a result of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

50.     Plaintiff's and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

51.     Plaintiff's and Class Members' unsecured PHI was viewed by unauthorized persons in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach.

52.     Electrostim reasonably believes that Plaintiff's and Class Members' unsecured PHI was viewed by unauthorized persons in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach.

53.     It is reasonable to infer that Plaintiff's and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

54.     It should be rebuttably presumed that unsecured PHI acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

55.     After receiving notice that they were victims of the Data Breach (which required the filing of a data breach report in accordance with 45 CFR § 164.408(a)), it is reasonable for recipients of that notice, including Plaintiff and Class Members in this case, to believe that future

harm (including medical identity theft) is real and imminent, and to take steps necessary to mitigate that risk of future harm.

56.    In addition, Electrostim's Data Breach could have been prevented if Electrostim had implemented HIPAA mandated, industry standard policies and procedures for securely disposing of PHI when it was no longer necessary and/or had honored its obligations to its patients.

57.    Electrostim's security failures also include, but are not limited to:

a.  Failing to maintain an adequate data security system to prevent data loss;

b.  Failing to mitigate the risks of a data breach and loss of data;

c.  Failing to ensure the confidentiality and integrity of electronic protected health information Electrostim creates, receives, maintains, and transmits in violation of 45 CFR 164.306(a)(1);

d.  Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 CFR 164.312(a)(1);

e.  Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 CFR 164.308(a)(1);

f.  Failing to identify and respond to suspected or known security incidents;

g.  Failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 CFR 164.308(a)(6)(ii);

h.  Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 CFR 164.306(a)(2);

     i.   Failing to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 CFR 164.306(a)(3);

     j.   Failing to ensure compliance with HIPAA security standard rules by Defendant's workforce, in violation of 45 CFR 164.306(a)(94); and

     k.   Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons, in violation of 45 CFR 164.502, *et seq.*

58.    The HIPAA Breach Notification Rule, 45 CFR §§ 164.400-414 also required Electrostim to provide notice of the Data Breach to each affected individual "without unreasonable delay and ***in no case later than 60 days following discovery of the breach***" (emphasis added).

59.    Because Electrostim has failed to comply with HIPAA, while monetary relief may cure some of Plaintiff's and Class Members' injuries, injunctive relief is also necessary to ensure Electrostim's approach to information security is adequate and appropriate going forward. Electrostim still maintains the PHI and other highly sensitive PII of its current and former patients, including Plaintiff and Class Members. Without the supervision of the Court through injunctive relief, Plaintiff's and Class Members' Private Information remains at risk of subsequent data breaches.

## E.  Electrostim Failed to Comply with FTC Guidelines

60.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision

making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

61.     In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

62.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

63.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

64.     As evidenced by the Data Breach, Electrostim failed to properly implement basic data security practices. Electrostim's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

65.     Electrostim was at all times fully aware of its obligation to protect the Private Information of its clients' patients yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so.

## F.  Electrostim Failed to Comply with Industry Standards

66.     As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

67.     Some industry best practices that should be implemented by businesses dealing with sensitive PHI like Electrostim include but are not limited to educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendant failed to follow some or all of these industry best practices.

68.     Other best cybersecurity practices that are standard in the industry include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendant failed to follow these cybersecurity best practices.

69.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

70.     Defendant failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

### G. Electrostim Breached its Duty to Safeguard Plaintiff's and Class Members' Private Information

71.     In addition to its obligations under federal and state laws, Electrostim owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Electrostim owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class Members

72.     Electrostim breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. Electrostim's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

    a.   Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

    b.   Failing to adequately protect its clients' patients' Private Information;

16

    c.   Failing to properly monitor its own data security systems for existing intrusions;

    d.   Failing to sufficiently train its employees regarding the proper handling of its patients Private Information;

    e.   Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

    f.   Failing to adhere to HIPAA and industry standards for cybersecurity as discussed above; and

    g.   Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' Private Information.

73.    Electrostim negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information by allowing cyberthieves to access its computer network and systems which contained unsecured and unencrypted Private Information.

74.    Had Electrostim remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential Private Information.

75.    Accordingly, Plaintiff's and Class Members' lives were severely disrupted. What's more, they have been harmed as a result of the Data Breach and now face an increased risk of future harm that includes, but is not limited to, fraud and identity theft. Plaintiff and Class Members also lost the benefit of the bargain they made with Electrostim.

### H. Electrostim Should Have Known that Cybercriminals Target PII and PHI to Carry Out Fraud and Identity Theft

76.    The FTC hosted a workshop to discuss "informational injuries," which are injuries that consumers like Plaintiff and Class Members suffer from privacy and security incidents such

as data breaches or unauthorized disclosure of data.[11] Exposure of highly sensitive personal information that a consumer wishes to keep private may cause harm to the consumer, such as the ability to obtain or keep employment. Consumers' loss of trust in e-commerce also deprives them of the benefits provided by the full range of goods and services available which can have negative impacts on daily life.

77.     Any victim of a data breach is exposed to serious ramifications regardless of the nature of the data that was breached. Indeed, the reason criminals steal information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims or to take over victims' identities in order to engage in illegal financial transactions under the victims' names.

78.     Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

79.     In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect."

---

[11] *FTC Information Injury Workshop, BE and BCP Staff Perspective,* Federal Trade Commission, (October 2018), *available at* https://www.ftc.gov/system/files/documents/reports/ftc-informational-injury-workshop-be-bcp-staff-perspective/informational_injury_workshop_staff_report_-_oct_2018_0.pdf (last visited on Jan. 9, 2024).

Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

80.     Thus, even if certain information were not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class Members' Private Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiff and Class Members.

81.     One such example of this is the development of "Fullz" packages.

82.     Cybercriminals can cross-reference two sources of the Private Information compromised in the Data Breach to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

83.     The development of "Fullz" packages means that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and the proposed Class's phone numbers, email addresses, and other sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card or financial account numbers may not be included in the Private Information stolen in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff and other Class Members' stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

84.     For these reasons, the FTC recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7 years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[12] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

85.     In fact, a study by the Identity Theft Resource Center[13] shows the multitude of harms caused by fraudulent use of PII:



---

[12] *See IdentityTheft.gov,* Federal Trade Commission, *available at* https://www.identitytheft.gov/Steps (last visited Jan. 8, 2024).

[13] Steele, Jason, *Credit Card and ID Theft Statistics*, CreditCards.com (October 23, 2017), *available at* https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276/ (last visited on Jan. 9, 2024).

86.     PHI is also especially valuable to identity thieves.  As the FTC recognizes, identity thieves can use PHI to commit an array of crimes, including identity theft and medical and financial fraud.[14]

87.     Indeed, a robust cyber black market exists in which criminals openly post stolen PHI on multiple underground Internet websites, commonly referred to as the dark web.

88.     While credit card information and associated PII can sell for as little as $1-$2 on the black market, protected health information can sell for as much as $363 according to the Infosec Institute.[15]

89.     PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

90.     Medical identity theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[16]

---

[14] Federal Trade Commission, *Warning Signs of Identity Theft, available at*: https://consumer.ftc.gov/articles/what-know-about-identity-theft (last visited on Jan. 9, 2024).

[15] Center for Internet Security, *Data Breaches: In the Healthcare Sector, available at*: https://www.cisecurity.org/insights/blog/data-breaches-in-the-healthcare-sector (last visited on Jan. 9, 2024).

[16] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, *available at*: https://kffhealthnews.org/news/rise-of-indentity-theft/ (last visited on Jan. 9, 2024).

91.     The ramifications of Electrostim's failure to keep its patients' Private Information secure are long-lasting and severe. Once it is stolen, fraudulent use of such and damage to victims may continue for years.

92.     The value of both PII and PHI is axiomatic. The value of "big data" in corporate America is astronomical. The fact that identity thieves attempt to steal identities notwithstanding possible heavy prison sentences illustrates beyond a doubt that the Private Information compromised here has considerable market value.

93.     It must also be noted that there may be a substantial time lag between when harm occurs and when it is discovered, and also between when PII and/or PHI is stolen and when it is misused. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:[17]

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

94.     PII and PHI are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the dark web for years.

95.     As a result, Plaintiff and Class Members are at an increased risk of fraud and identity theft, including medical identity theft, for many years into the future. Thus, Plaintiff and Class Members have no choice but to vigilantly monitor their accounts for many years to come.

---

[17] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO (June 2007), *available at* https://www.gao.gov/assets/270/262904.html (last visited Jan. 8, 2024).

## I.  *Plaintiff's and Class Members' Damages*

*Plaintiff Vernon's Experience*

96.     Plaintiff Vernon is unaware of exactly how Defendant obtained her Private Information, though she believes that it was through her affiliation with one or more of her local healthcare providers. As a result, Plaintiff Vernon entrusted her Private Information to Defendant.

97.     In or around early January of 2023, Plaintiff Vernon received the Notice from Defendant which told her that her Private Information had been accessed and acquired as a result of the Data Breach. The notice letter informed her that the Private Information stolen included her "name, demographic information such as address, email and phone number(s), diagnosis, insurance information and subscriber number, and products prescribed and billed."

98.     The notice letter offered Plaintiff Vernon a limited amount of credit monitoring services – an amount that is insufficient given that Plaintiff will now experience a lifetime of increased risk of identity theft, including but not limited to, potential medical fraud.

99.     Plaintiff Vernon suffered actual injury in the form of time spent dealing with the Data Breach monitoring her accounts for fraud and sorting through phishing emails, phone calls, and text messages, which targeted communications only recently increased soon after the Data Breach. Plaintiff Vernon now also suffers from the increased and substantial risk of fraud, including medical fraud, resulting from the Data Breach.

100.     Plaintiff Vernon would not have provided her Private Information to Defendant had Defendant timely disclosed that its systems lacked adequate computer and data security practices to safeguard highly sensitive personal and health information from theft, and that those systems were subject to a data breach.

101.    Plaintiff Vernon suffered actual injury in the form of having her PII and PHI stolen as a result of the Data Breach.

102.    Plaintiff Vernon suffered actual injury in the form of damages to and diminution in the value of her personal, health, and financial information – a form of intangible property that Plaintiff Vernon entrusted to Defendant for the purpose of receiving healthcare services from Defendant and which was compromised in, and as a result of, the Data Breach.

103.    Plaintiff Vernon suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by her Private Information being placed in the hands of criminals.

104.    Plaintiff Vernon has a continuing interest in ensuring that her PII and PHI, which remain in the possession of Defendant, are protected and safeguarded from future breaches.

105.    As a result of the Data Breach, Plaintiff Vernon made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach and the credit monitoring offered by Defendant, as well as monitoring her personal, medical, and financial accounts. Plaintiff Vernon has spent several hours dealing with the Data Breach – valuable time she otherwise would have spent on other activities.

106.    As a result of the Data Breach, Plaintiff Vernon has suffered anxiety as a result of the release of her PII and PHI, which she believed would be protected from unauthorized access and disclosure. These feelings include anxiety about unauthorized parties viewing, selling, and/or using her PII and PHI for purposes of committing cyber and other crimes against her including, but not limited to, fraud and identity theft. Plaintiff Vernon is very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach would have on her life.

107.    Plaintiff Vernon also suffered actual injury from having her Private Information compromised as a result of the Data Breach in the form of (a) damage to and diminution in the value of her PII and PHI, a form of property that Defendant obtained from Plaintiff Vernon; (b) violation of her privacy rights; and (c) present, imminent, and impending injury arising from the increased risk of identity theft, and fraud she now faces.

108.    As a result of the Data Breach, Plaintiff Vernon anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms to her that were caused by the Data Breach.

109.    In sum, Plaintiff and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

110.    Plaintiff and Class Members entrusted their Private Information to Defendant in order to receive Defendant's services.

111.    Their Private Information was subsequently compromised as a direct and proximate result of the Data Breach, which Data Breach resulted from Defendant's inadequate data security practices.

112.    As a direct and proximate result of Electrostim's actions and omissions, Plaintiff and Class Members have been harmed and are at an imminent, immediate, and continuing increased risk of harm, including but not limited to, having medical services billed in their names, and other forms of identity theft.

113.    Further, and as set forth above, as a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have also been forced to take the time and effort to mitigate the actual and potential impact of the data breach on their everyday lives, including placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing

25

or modifying financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

114.    Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

115.    Plaintiff and Class Members also face a substantial risk of being targeted in future phishing, data intrusion, and other illegal schemes through the misuse of their Private Information, since potential fraudsters will likely use such Private Information to carry out such targeted schemes against Plaintiff and Class Members.

116.    The Private Information maintained by and stolen from Defendant's systems, combined with publicly available information, allows nefarious actors to assemble a detailed mosaic of Plaintiff and Class Members, which can also be used to carry out targeted fraudulent schemes against Plaintiff and Class Members.

117.    Furthermore, Defendant's poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to obtain medical services at Defendant's clients under certain terms, Plaintiff and other reasonable patients understood and expected that Defendant would properly safeguard and protect their Private Information, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received medical services of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant's clients.

118.    Additionally, Plaintiff and Class Members also suffered a loss of value of their PII and PHI when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases. An active and robust legitimate

26

marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[18] In fact, consumers who agree to provide their web browsing history to the Nielsen Corporation can in turn receive up to $50 a year.[19]

119.    As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and illegal markets, has been harmed and diminished due to its acquisition by cybercriminals. This transfer of valuable information happened with no consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is apparently readily available to others, and the rarity of the Private Information has been destroyed because it is no longer only held by Plaintiff and the Class Members, and because that data no longer necessarily correlates only with activities undertaken by Plaintiff and the Class Members, thereby causing additional loss of value.

120.    Finally, Plaintiff and Class Members have suffered or will suffer actual injury as a direct and proximate result of the Data Breach in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

121.    Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to still be in the possession of Electrostim, is protected from future breaches by the implementation of more adequate data security measures and safeguards, including but not limited to, ensuring that the storage of data or documents containing highly sensitive personal and health information of its clients' patients is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

---

[18] *See* https://thequantumrecord.com/blog/data-brokers-profit-from-our-data/#:~:text=The%20business%20of%20data%20brokering,annual%20revenue%20of%20%24200%20billion. (last visited on Jan. 9, 2024).

[19] *Frequently Asked Questions,* Nielsen Computer & Mobile Panel, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited on Jan. 9, 2024).

122.     As a direct and proximate result of Electrostim's actions and inactions, Plaintiff and Class Members have suffered a loss of privacy and have suffered cognizable harm, including an imminent and substantial future risk of harm, in the forms set forth above.

## V.     CLASS ACTION ALLEGATIONS

123.     Plaintiff brings this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

124.     Specifically, Plaintiff proposes the following Nationwide Class (also referred to herein as the "Class"), subject to amendment as appropriate:

**Nationwide Class**

All individuals in the United States who had Private Information accessed and/or acquired as a result of the Data Breach, including all who were sent a notice of the Data Breach.

125.     Excluded from the Class are Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

126.     Plaintiff reserves the right to modify or amend the definitions of the proposed Nationwide Class, as well as to add subclasses, before the Court determines whether certification is appropriate.

127.     The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

128.     <u>Numerosity</u>. The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, based on information and belief, the Class consists of at least five hundred thousand (500,000) individuals whose data was compromised in the Data Breach. The identities of Class Members are

28

ascertainable through Electrostim's records, Class Members' records, publication notice, self-identification, and other means.

129.   <u>Commonality</u>. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

    a.   Whether Electrostim engaged in the conduct alleged herein;

    b.   Whether Electrostim's conduct violated the FTCA and HIPAA;

    c.   When Electrostim learned of the Data Breach;

    d.   Whether Electrostim's response to the Data Breach was adequate;

    e.   Whether Electrostim unlawfully lost or disclosed Plaintiff's and Class Members' Private Information;

    f.   Whether Electrostim failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

    g.   Whether Electrostim's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

    h.   Whether Electrostim's data security systems prior to and during the Data Breach were consistent with industry standards;

    i.   Whether Electrostim owed a duty to Class Members to safeguard their Private Information;

    j.   Whether Electrostim breached its duty to Class Members to safeguard their Private Information;

k.  Whether hackers obtained Class Members' Private Information via the Data Breach;

l.  Whether Electrostim had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and the Class Members;

m.  Whether Electrostim breached its duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

n.  Whether Electrostim knew or should have known that its data security systems and monitoring processes were deficient;

o.  What damages Plaintiff and Class Members suffered as a result of Electrostim's misconduct;

p.  Whether Electrostim's conduct was negligent;

q.  Whether Electrostim was unjustly enriched;

r.  Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

s.  Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

130.  <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class Members because, *inter alia*, all Class Members were injured through the common misconduct of Electrostim. Plaintiff is advancing the same claims and legal theories on behalf of herself and all other Class Members,

and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of Class Members arise from the same operative facts and are based on the same legal theories.

131.    <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

132.    <u>Predominance</u>. Electrostim has engaged in a common course of conduct toward Plaintiff and Class Members in that all of Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Electrostim's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

133.    <u>Superiority</u>. A Class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Electrostim. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

134.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). Electrostim has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

135.    Finally, all members of the proposed Class are readily ascertainable. Electrostim has access to the names and addresses and/or email addresses of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Electrostim.

## CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE
### (ON BEHALF OF PLAINTIFF AND THE NATIONWIDE CLASS)

136.    Plaintiff restates and realleges all of the allegations stated in paragraphs 1 to 135 as if fully set forth herein.

137.    Electrostim knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

138.    Electrostim's duty also included a responsibility to implement processes by which it could detect and analyze a breach of its security systems quickly and to give prompt notice to those affected in the case of a cyberattack.

139.    Electrostim knew or should have known of the risks inherent in collecting the Private Information of Plaintiff and Class Members and the importance of adequate security. Electrostim was on notice because, on information and belief, it knew or should have known that it would be an attractive target for cyberattacks.

140.    Electrostim owed a duty of care to Plaintiff and Class Members whose Private Information was entrusted to it. Electrostim's duties included, but were not limited to, the following:

      a.  To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;

      b.  To protect its clients' patients' Private Information using reasonable and adequate security procedures and systems compliant with industry standards;

      c.  To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in its possession;

      d.  To employ reasonable security measures and otherwise protect the Private Information of Plaintiff and Class Members pursuant to HIPAA and the FTCA;

      e.  To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

      f.  To promptly notify Plaintiff and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

141.    Electrostim's duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

142.    Electrostim's duty also arose because Defendant was bound by industry standards to protect its clients' patients' confidential Private Information.

143. Plaintiff and Class Members were foreseeable victims of any inadequate security practices on the part of Defendant, and Electrostim owed them a duty of care to not subject them to an unreasonable risk of harm.

144. Electrostim, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' Private Information within Electrostim's possession.

145. Electrostim, by its actions and/or omissions, breached its duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiff and Class Members.

146. Electrostim, by its actions and/or omissions, breached its duty of care by failing to promptly identify the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose Private Information was compromised.

147. Electrostim breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of its networks and systems;

c. Failing to periodically ensure that its email system maintained reasonable data security safeguards;

d. Allowing unauthorized access to Class Members' Private Information;

e. Failing to comply with the FTCA;

f.  Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

g.  Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

148.  Electrostim acted with reckless disregard for the rights of Plaintiff and Class Members by failing to provide prompt and adequate individual notice of the Data Breach such that Plaintiff and Class Members could take measures to protect themselves from damages caused by the fraudulent use of the Private Information compromised in the Data Breach.

149.  Electrostim had a special relationship with Plaintiff and Class Members. Plaintiff's and Class Members' willingness to entrust Electrostim with their Private Information was predicated on the understanding that Electrostim would take adequate security precautions. Moreover, only Electrostim had the ability to protect its systems (and the Private Information that it stored on them) from attack.

150.  Electrostim's breach of duties owed to Plaintiff and Class Members caused Plaintiff's and Class Members' Private Information to be compromised and exfiltrated, as alleged herein.

151.  As a result of Electrostim's ongoing failure to notify Plaintiff and Class Members regarding exactly what Private Information has been compromised, Plaintiff and Class Members have been unable to take the necessary precautions to prevent future fraud and mitigate damages.

152.  Electrostim's breaches of duty also caused a substantial, imminent risk to Plaintiff and Class Members of identity theft, loss of control over their Private Information, and/or loss of time and money to monitor their accounts for fraud.

153.     As a result of Electrostim's negligence in breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

154.     Electrostim also had independent duties under state laws that required it to reasonably safeguard Plaintiff's and Class Members' Private Information and promptly notify them about the Data Breach.

155.     As a direct and proximate result of Electrostim's negligent conduct, Plaintiff and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

156.     The injury and harm that Plaintiff and Class Members suffered was reasonably foreseeable.

157.     Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

158.     In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Electrostim to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

**COUNT II**
**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**
**(ON BEHALF OF PLAINTIFF AND THE NATIONWIDE CLASS)**

159.     Plaintiff restates and realleges all of the allegations stated in paragraphs 1 to 135 as if fully set forth herein.

160.     Upon information and belief, Defendant entered into virtually identical contracts with its clients to provide healthcare support products and services, which included data security

practices, procedures, and protocols sufficient to safeguard the Private Information that was to be entrusted to it.

161.    Such contracts were made expressly for the benefit of Plaintiff and the Class, as it was their Private Information that Defendant agreed to receive and protect through its services. Thus, the benefit of collection and protection of the Private Information belonging to Plaintiff and the Class was the direct and primary objective of the contracting parties, and Plaintiff and Class Members were direct and express beneficiaries of such contracts.

162.    Defendant knew that if it were to breach these contracts with its clients, Plaintiff and the Class would be harmed.

163.    Defendant breached its contracts with its clients and, as a result, Plaintiff and Class Members were affected by this Data Breach when Defendant failed to use reasonable data security and/or business associate monitoring measures that could have prevented the Data Breach.

164.    As foreseen, Plaintiff and the Class were harmed by Defendant's failure to use reasonable data security measures to securely store and protect the files in its care, including but not limited to, the continuous and substantial risk of harm through the loss of their Private Information.

165.    Accordingly, Plaintiff and the Class are entitled to damages in an amount to be determined at trial, along with costs and attorneys' fees incurred in this action.

## COUNT III
## UNJUST ENRICHMENT
## (ON BEHALF OF PLAINTIFF AND THE NATIONWIDE CLASS)

166.    Plaintiff restates and realleges all of the allegations stated in paragraphs 1 to 135 as if fully set forth herein.

167.    This Count is pleaded in the alternative to her breach of third-party beneficiary contract above.

168.    Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they provided Defendant with their Private Information. In exchange, Plaintiff and Class Members should have received from Defendant's clients the services that were the subject of the transaction(s) and should have had their Private Information protected with adequate data security.

169.    Defendant knew that Plaintiff and Class Members conferred a benefit on it in the form their Private Information as a necessary part of their receiving healthcare services from Defendant's clients. Defendant appreciated and accepted that benefit. Defendant profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

170.    Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments on behalf of or for the benefit of Plaintiff and some Class Members.

171.    As such, a portion of the payments made for the benefit of or on behalf of Plaintiff and Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

172.    Defendant, however, failed to secure Plaintiff's and Class Members' Private Information and, therefore, did not provide adequate data security in return for the benefit Plaintiff and Class Members provided.

173.    Defendant would not be able to carry out an essential function of its regular business without the Private Information of Plaintiff and Class Members and derived revenue by

using it for business purposes. Plaintiff and Class Members expected that Defendant or anyone in Defendant's position would use a portion of that revenue to fund adequate data security practices.

174.   Defendant acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

175.   If Plaintiff and Class Members knew that Defendant had not reasonably secured their Private Information, they would not have provided their Private Information to Defendant.

176.   Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profit at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their Private Information.

177.   Under the principles of equity and good conscience, Defendant should not be permitted to retain the money wrongfully obtained Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

178.   Plaintiff and Class Members have no adequate remedy at law.

179.   As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) the loss of the opportunity to control how their Private Information is used; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the

prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Electrostim's possession and is subject to further unauthorized disclosures so long as Electrostim fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and (vi) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

180.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

181.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

**COUNT IV**
**DECLARATORY JUDGMENT**
**(ON BEHALF OF PLAINTIFF AND THE NATIONWIDE CLASS)**

182.    Plaintiff restates and realleges all of the allegations stated in paragraphs 1 to 135 as if fully set forth herein.

183.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant

further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal laws and regulations described in this Complaint.

184.    Electrostim owes a duty of care to Plaintiff and Class Members, which required it to adequately secure Plaintiff's and Class Members' Private Information.

185.    Electrostim still possesses Private Information regarding Plaintiff and Class Members.

186.    Plaintiff alleges that Electrostim's data security measures remain inadequate. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of her Private Information and the risk remains that further compromises of her Private Information will occur in the future.

187.    Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.  Electrostim owes a legal duty to secure its clients' patients' Private Information and to timely notify them of a data breach under the common law, HIPAA, and the FTCA;

b.  Electrostim's existing security measures do not comply with its explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect its clients' patients' Private Information; and

c.  Electrostim continues to breach this legal duty by failing to employ reasonable measures to secure its clients' patients' Private Information.

188.     This Court should also issue corresponding prospective injunctive relief requiring Electrostim to employ adequate security protocols consistent with legal and industry standards to protect patients' Private Information, including the following:

a.   Order Electrostim to provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

b.   Order that, to comply with Defendant's explicit or implicit contractual obligations and duties of care, Electrostim must implement and maintain reasonable security measures, including, but not limited to:

   i.     engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Electrostim's systems on a periodic basis, and ordering Electrostim to promptly correct any problems or issues detected by such third-party security auditors;

   ii.    engaging third-party security auditors and internal personnel to run automated security monitoring;

   iii.   auditing, testing, and training its security personnel regarding any new or modified procedures;

   iv.    segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Electrostim's systems;

   v.     conducting regular database scanning and security checks;

vi.     routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

vii.    meaningfully educating its clients and their respective patients about the threats they face with regard to the security of their Private Information, as well as the steps they should take to protect themselves.

189.   If an injunction is not issued, Plaintiff will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach at Electrostim. The risk of another such breach is real, immediate, and substantial. If another breach at Electrostim occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

190.   The hardship to Plaintiff if an injunction does not issue exceeds the hardship to Electrostim if an injunction is issued. Plaintiff will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of Electrostim's compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Electrostim has a pre-existing legal obligation to employ such measures.

191.   Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach at Electrostim, thus preventing future injury to Plaintiff and other patients whose Private Information would be further compromised.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, on behalf of herself and the Class described above, seeks the following relief:

a. An order certifying this action as a Class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff is a proper representative of the Nationwide Class requested herein;

b. Judgment in favor of Plaintiff and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

c. An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d. An order instructing Electrostim to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members;

e. An order requiring Electrostim to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f. A judgment in favor of Plaintiff and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

g. An award of such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all triable issues.

44

Dated: January 9, 2024

/s/Jessica Wallace
 Jessica Wallace (Bar No. 1008325)
**SIRI & GLIMSTAD LLP**
20200 West Dixie Highway, Suite 902
Aventura, FL 33180
Tel: (786) 244-5660
E: jwallace@sirillp.com


Mason A. Barney (*pro hac vice* to be filed)
Tyler J. Bean (*pro hac vice* to be filed)
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, NY 10151
Tel: (212) 532-1091
E: mbarney@sirillp.com
E: tbean@sirillp.com

*Counsel for Plaintiffs and the Putative Class*